

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY KOSSEFF, Individually and On Behalf of All Others Similarly Situated, ) | CIVIL ACTION NO. 07-cv-10984 |
| Plaintiff, ) | "ECF CASE" |
| vs. ) | AMENDED CLASS ACTION COMPLAINT |
| MERRILL LYNCH & CO., INC., MERRILL LYNCH CAPITAL TRUST I, MERRILL LYNCH CAPITAL TRUST II, MERRILL LYNCH CAPITAL TRUST III, E. STANLEY O'NEAL, AHMASS L. FAKAHANY, GREGORY J. FLEMING, JEFFREY N. EDWARDS, LAURENCE A. TOSI, CAROL T. CHRIST, ARMANDO M. CODINA, VIRGIS W. COLBERT, JILL K. CONWAY, ALBERTO CRIBIORE, JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, DAVID K. NEWBIGGING, AULANA . PETERS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O. ROSSOTTI, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC., MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES LLC, WACHOVIA CAPITAL MARKETS, LLC, and DELOITTE & TOUCH LLP, ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Merrill Lynch & Co., Inc. ("Merrill" or the "Company"), as well as press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock and preferred securities of Merrill between November 3, 2006, and November 2, 2007 (the "Class Period"), as well as purchasers of Merrill preferred securities in or traceable to various initial public offerings described below.

2.     During the Class Period, Merrill issued statements regarding the Company's business and financial results that contained untrue statements of material fact.  Although Merrill had gone heavily into Collaterized Debt Obligations("CDOs") which generated higher yields in the short term but which would be devastating to the Company as the real estate market continued to soften and the risky loans led to losses, statements issued by Merrill did not reveal the true extent of its exposure to this market.  As a result of these untrue statements of material fact, Merrill common stock and preferred securities traded at artificially inflated prices during the Class Period.  In addition, these untrue statements of material fact were incorporated into registration statements issued in conjunction with offerings of preferred securities.  Beginning on October 24, 2007, the truth was revealed regarding Merrill's exposure to CDOs, causing the price of Merrill's common stock and preferred securities to drop precipitously.

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2), and15 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77k, 77l(2) and 77o], §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

4.      This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act [15 U.S.C. § 77v], § 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. §§ 1331 and 1337.

5.      Venue is proper in this Judicial District pursuant to § 22(a) of the Securities Act [15 U.S.C. §77v], § 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

6.      In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

### PLAINTIFF

7.      Plaintiff, Gary Kosseff, as set forth in the accompanying certification, incorporated by reference herein, purchased 6.45% Trust II Preferred Securities in its initial public offering directly from an underwriter at the offering price and 7.375% Trust III Preferred Securities in its initial public offering directly from an underwriter at the offering price.

### CORPORATE DEFENDANTS

8.      Defendant Merrill Lynch & Co., Inc., a Delaware corporation, is a holding corporation and has its headquarters at 4 World Financial Center, 250 Vesey Street, New York, New York. Through its various subsidiaries, Merrill is the largest securities broker in the United States, claims to be one of the world's leading wealth management, capital markets and advisory companies, with

offices in 38 countries and territories and total client assets of approximately $1.8 trillion and also claims to be a leading global trader and underwriter of securities and derivatives and a strategic advisor to corporations, governments, institutions, and individuals worldwide.

9.     Defendant Merrill Lynch Capital Trust I ("ML Trust I") is a Delaware statutory trust wholly owned by Merrill and created for the purpose of offering the 6.45% Trust I Preferred Securities.

10.     Defendant Merrill Lynch Capital Trust II ("ML Trust II") is a Delaware statutory trust wholly owned by Merrill and created for the purpose of offering the 6.45% Trust II Preferred Securities.

11.     Defendant Merrill Lynch Capital Trust III ("ML Trust III") is a Delaware statutory trust wholly owned by Merrill and created for the purpose of offering the 7.375% Trust III Preferred Securities.   Merrill, ML Trust I, ML Trust II, and ML Trust III are collectively referred to hereinafter as "the ML Corporate Defendants."

**OFFICER DEFENDANTS**

12.     Defendant E. Stanley O'Neal was at all relevant times a director, Chairman of the Board and Chief Executive Officer ("CEO") of Merrill. O'Neal was also Chief Operating Officer ("COO") of the Company from July 2001 to May 2007.  O'Neal signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering.  Merrill reportedly paid O'Neal a cash bonus of $18.5 million plus a stock grant of $26.8 million for 2006 based on the Company's purported performance.  On October 30, 2007, O'Neal resigned from his position.

13.    Defendant Ahmass L. Fakahany was President and COO of Merrill from May 2007 to February 1, 2008.  From 2005 to May 2007, Fakahany was Vice Chairman and Chief Administrative Officer of the Company.  Merrill reportedly paid Fakahany a cash bonus of $11.65 million plus a stock grant of $16 million for 2006 based on the Company's purported performance.  On February 1, 2008, Fakahany retired from the Company.

14.    Defendant Gregory J. Fleming has been President and COO of Merrill since May 2007.  From August 2003 to May 2007, Fleming was Executive Vice President of the Company.  Merrill reportedly paid Fleming a cash bonus of $13.25 million plus a stock grant of $18.4 million for 2006 based on the Company's purported performance.

15.    Defendant Jeffrey N. Edwards is, and, at all relevant times, was Senior Vice President and Chief Financial Officer ("CFO") of Merrill.  Edwards Fleming signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering.  Merrill reportedly paid Edwards a cash bonus of $5.625 million plus a stock grant of $8.183 million for 2006 based on the Company's purported performance.

16.    Defendants O'Neal, Fakahany, Fleming and Edwards are collectively referred to hereinafter as the "Officer Defendants."

17.    Defendants O'Neal, Fakahany, Fleming and Edwards, by reason of their management positions and membership and ownership of the Company's stock, were, at all relevant times, controlling persons of Merrill within the meaning of § 20(a) of the Exchange Act and § 15 of the Securities Act.  These defendants had the power and influence to cause Merrill to engage in the

unlawful acts and conduct alleged herein, and did exercise such power and influence.

**REGISTRATION STATEMENT DEFENDANTS**

18.     Defendant Laurence A. Tosi signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as Principal Accounting Officer of the Company.

19.     Defendant Carol T. Christ signed Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in her capacity as a member of the Board.

20.     Defendant Armando M. Codina signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

21.     Defendant Virgis W. Colbert signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

22.     Defendant Jill K. Conway signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering and Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering in her capacity as a member of the Board.

23.     Defendant Alberto Cribiore signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45%

Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

24.    Defendant John D. Finnegan signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

25.    Defendant Judith Mayhew Jonas signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in her capacity as a member of the Board.

26.    Defendant David K. Newbigging signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

27.    Defendant Aulana L. Peters signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in her capacity as a member of the Board.

28.    Defendant Joseph W. Prueher signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

29.    Defendant Ann N. Reese signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in her capacity as a member of the Board.

30.    Defendant Charles O. Rossotti signed Registration Statement Amendment No. 1 for the 6.45% Trust I Preferred Securities offering, Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering, and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering in his capacity as a member of the Board.

31.    Defendant Deloitte & Touche LLP is named in Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering as having prepared and certified certain reports, including Merrill's consolidated financial statements for 2006 and Merrill's management report on the effectiveness of internal control over financial reporting.

**UNDERWRITER DEFENDANTS**

32.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), a wholly owned subsidiary of Merrill, was assigned 6,195,000 shares of 6.45% Trust I Preferred Securities at a discount of $4,878,562, 5,472,000 shares of 6.45% Trust II Preferred Securities at a discount of $4,309,200, and 4,404,000 shares of 7.375% Trust III Preferred Securities at a discount of $3,468,150.

33.    Defendant Citigroup Global Markets Inc. ("Citigroup") was assigned 6,185,000 shares of 6.45% Trust I Preferred Securities at a discount of $4,870,687, 5,472,000 shares of 6.45% Trust II Preferred Securities at a discount of $4,309,200, and 4,404,000 shares of 7.375% Trust III Preferred

Securities at a discount of $3,468,150. Plaintiff Gary Koseff purchased 6.45% Trust II Preferred Securities and 7.375% Trust III Preferred Securities from Smith Barney, a wholly owned subsidiary of Citigroup, in the public offerings, on the day of the offerings, at the offering price.

34.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") was assigned 6,185,000 shares of 6.45% Trust I Preferred Securities at a discount of $4,870,687, 5,472,000 shares of 6.45% Trust II Preferred Securities at a discount of $4,309,200, and 4,404,000 shares of 7.375% Trust III Preferred Securities at a discount of $3,468,150.

35.    Defendant UBS Securities LLC ("UBS") was assigned 6,185,000 shares of 6.45% Trust I Preferred Securities at a discount of $4,870,687, 5,472,000 shares of 6.45% Trust II Preferred Securities at a discount of $4,309,200, and 4,404,000 shares of 7.375% Trust III Preferred Securities at a discount of $3,468,150.

36.    Defendant Wachovia Capital Markets, LLC ("Wachovia") was assigned 6,185,000 shares of 6.45% Trust I Preferred Securities at a discount of $4,870,687, 5,472,000 shares of 6.45% Trust II Preferred Securities at a discount of $4,309,200, and 4,404,000 shares of 7.375% Trust III Preferred Securities at a discount of $3,468,150.

37.    Defendants MLPF&S, Citigroup, Morgan Stanley, UBS, and Wachovia are referred to collectively as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock and preferred securities of the ML Corporate Defendants between November 3, 2006, and November 2, 2007, inclusive, and who were damaged thereby, seeking to

pursue remedies under the Securities Act and/or the Exchange Act. Excluded from the Class are defendants, the officers and directors of any corporate defendant at all relevant times, members of the immediate families of any defendant and their legal representatives, heirs, successors or assigns, and any entity in which any defendant has or had a controlling interest.

39. Plaintiff also bring the claims under the Securities Act, *i.e.*, the claims in Counts I-V below, on behalf of a subclass (the "Subclass") consisting of all persons who purchased or otherwise acquired preferred securities issued in or traceable to public offerings of 6.45% Trust I Preferred Securities, 6.45% Trust II Preferred Securities, and 7.375% Trust III Preferred Securities.

40. The members of the Class and Subclass are so numerous that joinder of all members is impracticable. While the exact number of Class and Subclass members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least thousands of members in the proposed Class and also in the proposed Subclass. Record owners and other members of the Class and Subclass may be identified from records maintained by the ML Corporate Defendants or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41. Plaintiff's claims are typical of the claims of the other members of the Class and Subclass as all members of the Class and Subclass are similarly affected by a substantial portion of the illegal conduct complained of herein.

42. Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to prosecute this action vigorously. Plaintiff is a member of the Class and the Subclass and does not have interests antagonistic to, or in conflict with, the other members of the Class or

Subclass.

43.    Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class or Subclass. Among the questions of law and fact common to the Class and Subclass are:

      (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)    for the Securities Act claims, whether registration statement amendments and prospectus supplements contained untrue statements of material fact and/or omitted to state material facts required to make the statements therein not misleading;

      (c)    for the Exchange Act claims, whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial statements and condition of Merrill;

      (d)    for the Exchange Act claims, whether the statements at issue were made with scienter; and

      (e)    whether defendants' acts caused plaintiffs' damages, and the proper measure of such damages.

44.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members is impracticable for both the Class and the Subclass.  Furthermore, as the damages suffered by individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class or Subclass to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## BACKGROUND

45.    Merrill, through its subsidiaries, offers capital markets services, investment banking and advisory services, wealth management, investment management, insurance, banking and related products and services worldwide.  The Company operates in two interrelated segments – Global Markets & Investment Banking Group ("GMI") and Global Wealth Management ("GWM"), consisting of Global Private Client ("GPC") and Global Investment Management ("GIM").  The GMI, institutional business segment, provides equity, debt, and commodities trading; capital market services; investment banking; and advisory services to corporations, financial institutions, governments, and institutional investors.  GMI's Global Markets division facilitates client transactions, engages in certain proprietary trading activities, and provides clients with financing, securities clearing, settlement and custody services, and also engages in principal and private equity investing.  Its Fixed Income, Currencies and Commodities ("FICC"), through its groups, is responsible, among others, for collateralized mortgage obligations, asset-backed securities trading and pass-through mortgage obligations trading, as well as secured commercial and residential real estate lending, and securitizations related to these transactions.  GMI's Investment Banking division provides a range of securities origination and advisory services for issuer clients, including underwriting and placement of public and private equity, debt and related securities, as well as lending and other financing activities for clients globally.  These services also include advising clients on strategic issues, valuation, mergers, acquisitions, and restructurings.  GWM, retail wealth management segment, provides brokerage, investment advisory, and financial planning services, and also offers commission and fee-based investment accounts; banking, cash management, and credit

services; trust and generational planning; retirement services; and insurance products to individuals, small- to mid-sized businesses, and employee benefit plans.  The Company also provides various research services through its Global Securities Research & Economics Group, and distributes research and analysis focusing on four main areas globally: fundamental equity research, fixed income and equity-linked research, economics and foreign exchange research, and investment strategy.

46.  Prior to the Class Period, Merrill had gotten deep into collateralized debt obligations ("CDOs") for the lucrative fees they generated.  As THE WALL STREET JOURNAL reported on October 25, 2007:

> From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. . . .
>
> . . . .  Long before joining Merrill, he helped push Wall Street into risky new areas such as subprime mortgages, those made to home buyers with weak credit.  Then he helped turn Merrill into the Wal-Mart of the CDO industry, before leaving behind a roughly $8 million annual paycheck to jump to a small firm that was a Merrill client.
>
> * * *
>
> Merrill, which continued to expand its CDO business aggressively after Mr. Ricciardi left, now is the biggest casualty of the downturn after underwriting many troubled CDOs in the past year.  In a conference call with investors yesterday, Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the CDO business: "The bottom line is, we got it wrong by being overexposed to subprime."  Mr. O'Neal added that Merrill had misjudged the risk of many CDOs.  "It turned out that both our assessment of the potential risk and mitigation strategies were inadequate," he said.
>
> * * *
>
> Long after signs of housing troubles first emerged in mid-2005, [Ricciardi] and his colleagues at Merrill were setting out to smash records by issuing ever more CDOs.
>
> From the manicured lawns at the exclusive Sleepy Hollow Country Club to the ski slopes of Jackson Hole, Wyo., and wood-paneled rooms of Manhattan's Harvard Club, they courted investors with promises of well managed risk and outsize returns.  They helped to build a small army of a new sort of finance professional, people who manage the mountain of complex debt instruments being created.

* * *

Corporate junk bonds provide high yields, but investors soured on them in the post-bubble years of 2001 and 2002 when defaults on corporate bonds spiked. With the housing market surging, mortgage securities seemed to many investors like a better bet. Mr. Ricciardi coached salespeople he worked with to stress that mortgage CDOs offered better interest rates than corporate bonds with similar ratings.

* * *

By the summer of 2001, Credit Suisse was selling at least one new CDO a month and vaulting up Wall Street's so-called underwriting league tables. In 2001 Credit Suisse underwrote CDOs worth $12.5 billion, nearly double those of No. 2 Deutsche Bank AG, according to Dealogic.

Merrill, by contrast, had a minuscule presence. Its top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative, fast-growing businesses. His priorities included debt financing and derivatives, or instruments whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

* * *

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

* * *

Merrill salespeople scoured the globe for buyers of CDOs, selling pieces of them to a wide range of investors such as Woori Bank in Seoul, Korea, AXA SA of France, Uniqa Group of Austria and investment funds in Australia and Singapore. Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill over a $134 million investment made this spring in CDOs that Merrill underwrote between 2003 and 2006, while Mr. Ricciardi was still there.

* * *

At Merrill, Mr. Ricciardi courted clients at his country club, Sleepy Hollow, where Merrill held an annual August golf outing for money managers and investors, and Merrill's top brass. One regular at the outings was Ralph Cioffi, who managed two Bear Steams Cos. hedge funds that invested heavily in Merrill Lynch CDOs. In a major casualty of the subprime mortgage turmoil this summer, the two Bear funds

ended up losing as much as $1.6 billion of investors' money.

Merrill distributed some of its riskiest CDO slices through its global network of wealthy private clients. One former Merrill executive recalls attending an event at New York's Harvard Club in 2004 at which salesmen described the merits of CDO investing to doctors, hedge-fund managers and businessmen. "They were all rich guys. We would explain how CDOs worked, and how much return they could get if losses didn't go above a certain level," says this former executive. A few individuals later agreed to invest.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

When Mr. Ricciardi left in February of 2006, signs of trouble in the housing market were already abundant, as both home-price appreciation and home builders' orders slowed. Cohen & Co., aiming to go public, offered Mr. Ricciardi an equity stake if he came aboard. He had wanted a bigger job at Merrill that went beyond CDO underwriting. When it didn't come, he jumped to Cohen – taking with him several Merrill bankers, salesmen and a technology expert.

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDOs at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs, say three people who heard him.

***That year, Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDOs jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.***

\* \* \*

At a Sleepy Hollow golf outing about a year ago, Mr. Ricciardi remarked to former Merrill colleagues that Merrill was doing business with too many unknown upstarts, now his competitors, according to a person familiar with the conversation.

This summer's meltdown in subprime mortgages and related securities was swift, hurting Cohen as well as Merrill. Mr. O'Neal yesterday vowed to downsize Merrill's business in structured finance. [Emphasis added.]

# PART I

## THE SECURITIES ACT CLAIMS PURSUANT
## TO §§ 11, 12(a)(2), AND 15 OF THE SECURITIES ACT

47.    Merrill's Form 10-Q for the quarter ending September 29, 2006, dated November 3, 2006, stated in part:

> Despite challenging market conditions during the third quarter of 2006, each of GMI's three major business lines- Fixed Income, Currencies, and Commodities ("FICC") (formerly Debt Markets), Equity Markets and Investment Banking – recorded increased net revenues compared with the third quarter of 2005. GMI's total net revenues were a record for a fiscal third quarter at $4.4 billion, up 21 percent from the year-ago quarter.  Pre-tax earnings were $1.5 billion, up 13 percent from the year-ago quarter, driven by strong net revenue growth.  The pre-tax profit margin was 33.2 percent, compared with 35.4 percent in the year-ago quarter, primarily due to higher expenses associated with investments for growth across the business, as well as the absence of a litigation provision reversal in the year-ago quarter.

> For the first nine months of 2006, GMI's net revenues were $13.5 billion, an increase of 30 percent from the first nine months of 2005.  Pre-tax earnings of $3.2 billion and the pre-tax profit margin of 23.4 percent included $1.4 billion in one-time compensation expenses incurred in the first quarter of 2006.  Excluding these onetime compensation expenses, pre-tax earnings for the first nine months of 2006 were $4.5 billion, up 29 percent from the year-ago period, and the pre-tax profit margin was 33.5 percent, down from 33.8 percent in the year-ago period.  . . .

> * * *

> **_Global Markets_**

> For the third quarter of 2006, Global Markets net revenues were $3.6 billion, up 26 percent from the year-ago quarter.  For the first nine months of 2006, Global Markets net revenues were a record at $10.9 billion, up 34 percent from the year-ago period.

> _Fixed Income, Currencies, and Commodities (formerly Debt Markets)_

> FICC net revenues include principal transactions and net interest profit (which management believes should be viewed in aggregate to assess trading results), commissions, revenues from principal investments, fair value adjustments on private equity investments made by non-broker-dealer subsidiaries that are held for capital appreciation and/or current income, and other revenues.  The business lines included in FICC are described in the Debt Markets section of the 2005 Annual Report. For the third quarter of 2006, FICC net revenues set a new quarterly record at $2.1

–16–

billion, up 26 percent from the third quarter of 2005. The increase in net revenues was driven primarily by increases in commodities and trading credit products, which more than offset declines from principal investing and trading interest rate products. The commodities results were driven principally by strong trading results in both natural gas and power in the United States and Europe, as well as significant revenues from structured transactions.

For the first nine months of 2006, FICC net revenues were $5.9 billion, up 20 percent from the first nine months of 2005, due primarily to the strong trading results in commodities and the trading of credit products. These increases were partially offset by declines in principal investing, rates, and foreign exchange.

*Equity Markets*

Equity Markets net revenues include commissions, principal transactions and net interest profit (which management believes should be viewed in aggregate to assess trading results), revenues from equity method investments, fair value adjustments on private equity investments that are held for capital appreciation and/or current income, and other revenues. The business lines included in Equity Markets are described in the 2005 Annual Report. During the third quarter of 2006, Equity Markets net revenues were $1.5 billion, an increase of 26 percent over the year-ago quarter, driven by higher revenues in private equity, cash trading, proprietary trading and equity financing and services. These increases were partially offset by a modest decline in equity-linked trading.

For the first nine months of 2006, Equity Markets net revenues were $4.9 billion, up 55 percent from the year-ago period, driven primarily by private equity-related gains, increased equity-linked and cash trading revenues, and higher equity financing and services net revenues.

48.    Merrill's Form 8-K dated January 18, 2007, contained a press release announcing

Merrill's financial results for fourth quarter and full year 2006, which release stated in part:

Merrill Lynch today reported record full-year net revenues, net earnings and earnings per diluted share for 2006, driven by strong growth in the firm's business segments. Net earnings for 2006 were $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to $34.7 billion.

Pretax earnings increased to a record $10.4 billion, the pretax profit margin rose to a record 30.1 percent, and the return on average common equity increased to 21.3 percent.  Book value per common share was $41.37, up 15 percent from 2005. Merrill Lynch's 2006 results included the onetime net gain arising from the closing of the merger between Merrill Lynch Investment Managers (MLIM) and BlackRock

during the third quarter, which was essentially offset by the one-time non-cash compensation costs recorded in the first quarter.

These one-time items, in aggregate, increased both full-year net revenues and non-interest expenses by approximately $2.0 billion, resulting in a slightly negative net impact to 2006 net earnings of $72 million, or 9 cents per diluted share. Adjusted to exclude the impact of those one-time items, full-year 2006 net earnings were $7.6 billion, up 48 percent from 2005, and net earnings per diluted share were $7.68, up 49 percent. On the same basis, pretax earnings of $10.4 billion increased 44 percent, as net revenues rose 26 percent to $32.7 billion; the pretax profit margin was 31.9 percent, up 4.1 percentage points; and the return on average common equity was 21.6 percent, up 5.6 percentage points. . . .

"We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

Fourth-quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71 percent from the year-ago quarter but down 24 percent from the third quarter of 2006, which included the onetime net gain from closing the BlackRock transaction. Similarly, pretax earnings of $3.4 billion were up 65 percent from the year-ago period but down 19 percent from the third quarter, as net revenues of $8.6 billion were up 27 percent from the year-ago quarter and down 13 percent sequentially. The fourth-quarter pretax profit margin was 39.0 percent, and the annualized return on common equity was 25.6 percent.

Excluding the one-time merger-related net benefits in the third quarter of 2006 from the sequential comparisons, Merrill Lynch's fourth quarter 2006 net earnings and diluted earnings per share were both 21 percent higher than the third quarter; pre-tax earnings were 42 percent higher; net revenues were 8 percent higher; and all those fourth-quarter results would have set quarterly records.

49. Merrill's Form 10-K for fiscal year 2006, dated February 26, 2007, stated in part:

During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a

–18–

variety of key growth initiatives around the world.  Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year.  Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim.  We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform.  We also made progress in key investment areas including both interest rate and credit derivatives, principal investing real estate, and foreign exchange.

Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation.  We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform.  This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments.  We also made progress in our equity linked trading business, another key area of investment which increased its revenues more than 50 percent in 2006.  Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds.  The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose.  We also continued to generate increased revenues and make significant new investments in our private equity business.

50.    Merrill's Form 8-K filed April 19, 2007, included a press release issuing Merrill's

financial results for the first quarter of 2007, which release stated in part:

Merrill Lynch today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion.  Net revenues were up 24 percent from the prior year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management

(GWM), and in all global regions. These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pretax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc.

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pretax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chef executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. . . .

**Global Markets** & **Investment Banking (GMI)**

GMI generated record revenues, both overall and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S.

revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

- GMI's first-quarter 2007 net revenue were a record $6.5 billion, up 43 percent from the year-ago quarter.  Compared with the first quarter of 2006, net revenues increased in all three major business lines:

- Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels.  Revenues from trading commodities also increased significantly.  Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

- Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

- Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

- Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth.  The first quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

51.    Merrill's Form 8-K filed with the SEC on July 17, 2007, included a press release announcing its financial results for the second quarter of 2007, which stated in part:

Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.

Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007.  Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase.  These are the highest net revenues

–21–

Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pre-tax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.

Second quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline, and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $1.09 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the

impact of these onetime expenses.

## THE DECEMBER 14, 2006 OFFERING

52.    On December 6, 2006, Merrill filed a Post-Effective Amendment No. 1 to Form S-3 Registration Statement ("Registration Statement Amendment No. 1") adding ML Trust I as an issuer and co-registrant to the Registration Statement and registering the 6.45% Trust I Preferred Securities as additional securities.

53.    On December 7, 2006, Merrill filed a Prospectus Supplement announcing its intent to sell 40,000,000 6.45% Trust I Preferred Securities at $25 per share (the "6.45% Trust I Preferred Prospectus Supplement").

54.    The 6.35% Trust I Preferred Prospectus Supplement also explained that the underwriters would receive a commission of $.7875 per share, and would have an opportunity to purchase up to 6,000,000 additional shares to cover over-allotments.

55.    Registration Statement Amendment No. 1 was declared effective on December 14, 2006.

56.    Registration Statement Amendment No. 1 incorporated Merrill's Form 10-Q for the quarter ended September 29, 2006, filed on November 3, 2006.

57.    Under the heading Experts, the Registration Statement Amendment No. 1 state:

> The consolidated financial statements, the related financial statement schedule, and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus supplement by reference from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 30, 2005 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

–23–

Registration Statement Amendment No. 1, at 3.

**THE APRIL 25, 2007 OFFERING**

58.    On April 23, 2007, Merrill filed a Post-Effective Amendment No. 2 to Form S-3 Registration Statement ("Registration Statement Amendment No. 2") adding ML Trust II as an issuer and co-registrant to the Registration Statement and registering the 6.45% Trust II Preferred Securities as additional securities.

59.    On April 25, 2007, Merrill filed a Prospectus Supplement announcing its intent to sell 36,000,000 6.45% Trust II Preferred Securities at $25 per share (the "6.45% Trust II Preferred Prospectus Supplement").

60.    The 6.45% Trust II Preferred Prospectus Supplement also explained that the underwriters would receive a commission of $.7875 per share, and would have the opportunity to purchase up to 5,400,000 additional shares to cover over-allotments, if any.

61.    Registration Statement Amendment No. 2 was declared effective on April 25, 2007.

62.    Registration Statement Amendment No. 2 incorporated Merrill's Form 10-K for the year ended December 29, 2006, as well as Merrill's Form 8-Ks dated January 18, 2007 and April 19, 2007.

63.    Under the heading Experts, the Registration Statement Amendment No. 2 stated:

The consolidated financial statements, the related financial statement schedule, and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus supplement by reference from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 29, 2006 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which (1) expressed an unqualified opinion on the consolidated financial statements and the related financial statement schedule and included an explanatory paragraph regarding the change in accounting method in 2006 for share-based payments to conform to Statement of Financial Accounting Standard No. 123 (revised 2004, (2) expressed an

–24–

unqualified opinion on management's assessment regarding the effectiveness of internal control over financial reporting, and (3) expressed an unqualified opinion on the effectiveness of internal control over financial reporting), *Share-Based Payment*) [*sic*] and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

Registration Statement Amendment No. 2, at 3.

64.    Likewise, under the heading Experts, the 6.45% Trust II Preferred Prospectus Supplement stated:

The consolidated financial statements, the related financial statement schedule, and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus supplement by reference from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 29, 2006 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) expressed an unqualified opinion on the consolidated financial statements and the related financial statement schedule and included an explanatory paragraph regarding the change in accounting method in 2006 for share-based payments to conform to Statement of Financial Accounting Standard No. 123 (revised 2004), *Share-Based Payment*, (2) expressed an unqualified opinion on management's assessment regarding the effectiveness of internal control over financial reporting, and (3) expressed an unqualified opinion on the effectiveness of internal control over financial reporting), and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

6.45% Trust II Preferred Prospectus Supplement, at S-50.

<u>**THE AUGUST 15, 2007 OFFERING**</u>

65.    On August 13, 2007, Merrill filed a Post-Effective Amendment No. 3 to Form S-3 Registration Statement ("Registration Statement Amendment No. 3," together with Registration Statement Amendment No. 1 and Registration Statement Amendment No. 2, the "Registration Statement Amendments") adding ML Trust III as an issuer and co-registrant to the Registration Statement and registering 7.375% Trust III Preferred Securities as additional securities.

66.    On August 15, 2007, Merrill filed a Final Prospectus Supplement (the "7.375% Trust III Preferred Prospectus Supplement," together with the 6.45% Trust I Preferred Prospectus

Supplement and the 6.45% Trust II Preferred Prospectus Supplement, the "Prospectus Supplements") announcing its intent to sell 30,000,000 7.375% Trust III Preferred Securities offered to the public in denominations of $25 each.

67.    The 7.375% Trust III Preferred Prospectus Supplement stated that the underwriters would purchase up to additional 4,500,000 additional 7.375% Trust III Preferred Securities to cover any over-allotments.  The underwriting commission was set at $.7875 per share.

68.    Registration Statement Amendment No. 3 was declared effective on August 15, 2007.

69.    Registration Statement Amendment No. 3 incorporated, among other things, Merrill's Form 10-K for the year ended December 29, 2006, as well as Merrill's Form 8-Ks dated January 18, 2007, April 19, 2007, and July 17, 2007.

70.    Under the heading Experts, the Registration Statement Amendment No. 3 stated:

> The consolidated financial statements, the related financial statement schedule, and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus by reference from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 29, 2006 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) expressed an unqualified opinion on the consolidated financial statements and the related financial statement schedule and included an explanatory paragraph regarding the change in accounting method in 2006 for share-based payments to conform to Statement of Financial Accounting Standard No. 123 (revised 2004), *Share-Based Payment* (2) expressed an unqualified opinion on management's assessment regarding the effectiveness of internal control over financial reporting, and (3) express an unqualified opinion on the effectiveness of internal control over financial reporting), and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

Registration Statement Amendment No. 3 at 3.

71.    Registration Statement Amendment No., Registration Statement Amendment No. 2, and Registration Statement Amendment No. 3 contained untrue statements of material fact and/or

omitted to state material facts required to make the statements not misleading. The true facts, as detailed below, were that the Company was more exposed to CDOs containing subprime debt than it disclosed, and there was hidden risk in the Company's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill's portfolio to be impaired.

**THE TRUTH IS REVEALED**

72.    On October 5, 2007, Merrill issued a press release announcing a $4.5 billion charge for the third quarter of 2007. In relation to the charge, O'Neal stated that:

> Despite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our [fixed income, currency and commodities] businesses than we expected earlier in the quarter. . . . While market conditions were extremely difficult and the degree of sustained dislocation unprecedented, we are disappointed in our performance in structured finance and mortgages. We can do a better job in managing this risk, as we have done with other asset classes, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities.

73.    The market did not react adversely to this news, as it was in line with charges taken by other banks as a result of the tightened credit market.

74.    Then, on October 24, 2007, Merrill issued a press release before the market opened announcing that the Company would take an $8 billion charge for the third quarter, instead of the $4.5 billion previously announced. The press release, titled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations of $2.85 Per Diluted Share; Record Net Revenues From Global Private Client, Equity Markets and Investment Banking for the First Nine Months of 2007," stated in part:

> Merrill Lynch today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the

–27–

merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the onetime items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these onetime items. . . .

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

- Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

- FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities.

*Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings prerelease. This is due to additional analyst and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.*

\* \* \*

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and

selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

- Equity Markets net revenues increased by 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

- Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

- The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

- GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

75. In reaction to this news of its largest quarterly loss in its 93 year history, the 7.375%

Trust III Preferred Securities closed down 1.25% from the previous day's close. The 6.45% Trust I

Preferred Securities closed down 2.2% from the previous day's close, while the 6.45% Trust II Preferred Securities closed down 1.4% from the previous day's close.

76.    Following what it characterized as Merrill's "startling" announcement, on October 24, 2007, Standard & Poor's Ratings Services lowered its credit ratings on Merrill from A+/A-1 to AA-/A-1+, with a negative outlook.

77.    Subsequently, on October 25, 2007, Merrill's 7.375% Trust III Preferred Securities closed down a total of 1.4% from the closing price of October 23, 2007. Merrill's 6.45% Trust II Preferred Securities closed down a total of 3.2% from the closing price of October 23, 2007, while the 6.45% Trust I Preferred securities closed down a total of 2.6% from the closing price of October 23, 2007.

78.    On November 1, 2007, the SEC initiated an informal investigation into whether Merrill had violated federal securities laws when it announced a $4.5 billion third quarter charge, rather than the $8 billion charge, in its press release of October 5, 2007.

79.    From Merrill's announcement on October 24 to November 2, Merrill's 7.375% Trust III Preferred Securities dropped a total of 5.3%. Merrill's 6.45% Trust II Preferred Securities dropped a total of 7.8%, while the 6.45% Trust I Preferred Securities dropped a total of 6.9%.

## COUNT I

### AGAINST THE ML CORPORATE DEFENDANTS, THE OFFICER DEFENDANTS, AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT

80.    Plaintiff realleges each of the allegations set forth above as if fully set forth herein. Plaintiff specifically does not incorporate Part II of this Complaint.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

81.    This Count is brought pursuant to § 11 of the Securities Act on behalf of plaintiff and all other Subclass members who purchased ML Corporate Defendants' preferred securities pursuant or traceable to the Registration Statement Amendments.

82.    Plaintiff purchased Merrill's 7.375% Trust III Preferred Securities and 6.45% Trust II Preferred Securities on the day of the offerings at the offering price.

83.    The Officer Defendants and the Registration Statement Defendants were directors or officers of Merrill during the time that some or all of the securities were issued, and signed various Registration Statement Amendments as stated herein.

84.    The SEC Form 10-K and 8-Ks incorporated by reference in the Registration Statement Amendments and Prospectus Supplements were signed by some or all of the Officer Defendants.

85.    The Registration Statement Amendments contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein not misleading, as set forth above.

86.    The Officer Defendants and the Registration Statement Defendants sued herein did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements made in the Registration Statement Amendments and Prospectus Supplements were true,

did not omit any material fact, and were not materially misleading.

87.    Plaintiff and the other members of the Subclass did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Registration Statement Amendments and Prospectus Supplements.

88.    Plaintiff and other members of the Subclass sustained damages as a result of the misstatements and omissions in the Registration Statement Amendments and Prospectus Supplements, for which they are entitled to compensation.

89.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the filing of the Registration Statement Amendments and Prospectus Supplements.

90.    None of the misrepresentations or omissions alleged herein were forward looking statements, but, rather, concerned existing facts.  Moreover, the ML Corporate Defendants, the Officer Defendants, and the Registration Statement Defendants did not properly identify any of these statements as forward-looking statements and did not disclose information, known to them, that undermined the validity of those statements.

## COUNT II

### AGAINST THE UNDERWRITER DEFENDANTS
### FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT

91.    Plaintiff realleges each of the allegations set forth above as if fully set forth herein. Plaintiff specifically does not incorporate Part II of this Complaint.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

92.    This Count is brought pursuant to § 11 of the Securities Act on behalf of plaintiff and all other Subclass members who purchased ML Corporate Defendants' preferred securities pursuant

or traceable to the Registration Statement Amendments.

93.    Plaintiff purchased Merrill's 7.375% Trust III Preferred Securities and 6.45% Trust II Preferred Securities on the day of the offerings at the offering price.

94.    The Underwriter Defendants served as underwriters of the above offerings and qualify as such according to the definition contained in § 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they participated in the solicitation, offering, and sale of the above securities to the investing public pursuant to the Registration Statement Amendments and the Prospectus Supplements.

95.    Due to their role as underwriters of these securities, the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement Amendments and Prospectus Supplements.  As such, they are liable under § 11 of the Securities Act for any material misrepresentations or omissions contained therein.  As alleged in detail herein, the Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Registration Statement Amendments and Prospectus Supplements were true, did not omit any material fact, and were not materially misleading.

96.    Plaintiff and the other Subclass members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement Amendments and Prospectus Supplements.

97.    Plaintiff and members of the Subclass have sustained damages as a result of the misstatements and omissions in the Registration Statement Amendments and Prospectus Supplements, for which they are entitled to compensation.

98.    Plaintiff brought this action within one year after the discovery of the untrue statements

and omissions, and within three years after the issuance of the Registration Statement Amendments and Prospectus Supplements.

99.   None of the misrepresentations or omissions alleged herein were forward looking statements, but, rather, concerned existing facts.  Moreover, the Underwriter Defendants did not properly identify any of these statements as forward-looking statements and did not disclose information, known to them, that undermined the validity of those statements.

### COUNT III

### AGAINST DELOITTE FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT

100.  Plaintiff realleges each of the allegations set forth above as if fully set forth herein.  Plaintiff specifically does not incorporate Part II of this Complaint.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

101.  This Count is brought on behalf of plaintiff and all other Subclass members who purchased ML Corporate Defendants' preferred securities pursuant or traceable to Registration Statement Amendment No. 2 and/or Registration Statement Amendment No. 3 pursuant to § 11 of the Securities Act.

102.  Deloitte was an independent accountant retained by Merrill to audit its financial statements.

103.  Deloitte issued unqualified audit opinions for Merrill's 2006 financial statements, which were incorporated by reference to the Registration Statement Amendment No. 2 and Registration Statement No. 3.  As such, Deloitte expressly consented to serve as an accounting "expert" with respect to the offering of the preferred securities.

104. Deloitte's unqualified opinions on Merrill's 2006 SEC Form 10-K, which were

incorporated by reference into Registration Statement Amendment No. 2 and Registration Statement Amendment No. 3, were materially false and misleading. Contrary to its representations, Deloitte's audit of those financial statements had not been presented in conformity with GAAP. Instead such statements contained untrue statements of material fact and failed to state facts necessary to make the statements not misleading.

105. As an accounting expert which consented to the use of its unqualified audit opinion in the Registration Statement Amendments and Prospectus Supplements above, Deloitte is liable under § 11 of the Securities Act for the material misrepresentations or omissions contained in its unqualified audit opinions and in Merrill's SEC Form 10-K for 2006, as reported and incorporated in Registration Statement Amendment No. 2 and Registration Statement Amendment No. 3. Deloitte did not possess reasonable grounds for believing that its representations in its unqualified audit opinion with regards to Merrill's financial statements were true, did not omit any material facts, and were not materially misleading.

106. Plaintiff and the other members of the Subclass did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of Registration Statement Amendment No. 2 or Registration Statement No. 3.

107. Plaintiff and other members of the Subclass sustained damages as a result of the misstatements and omissions in Registration Statement Amendment No. 2 and Registration Statement No. 3.

108. Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the filing of Registration Statement Amendment No. 2 and Registration Statement No. 3.

109.  None of the misrepresentations or omissions alleged herein were forward looking statements, but, rather, concerned existing facts.  Moreover, Deloitte did not properly identify any of these statements as forward-looking statements and did not disclose information, known to them, that undermined the validity of those statements.

### COUNT IV

### AGAINST THE ML CORPORATE DEFENDANTS, THE OFFICER DEFENDANTS, AND CITIGROUP FOR VIOLATIONS OF § 12(a)(2) OF THE SECURITIES ACT

110.  Plaintiff realleges each of the allegations set forth above as if fully set forth herein. Plaintiff specifically does not incorporate Part II of this Complaint.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

111.  This Count is brought on behalf of plaintiff and all other Subclass members who purchased the ML Corporate Defendants' preferred securities from Smith Barney, a wholly owned subsidiary of Citigroup, pursuant or traceable to Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering, pursuant to § 12(a)(2) of the Securities Act.

112.  Plaintiff purchased Merrill's 7.375% Trust III Preferred Securities and 6.45% Trust II Preferred Securities from Smith Barney, a wholly owned subsidiary of Citigroup, on the day of the offerings at the offering price.

113.  Plaintiff and the other members of the Subclass did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering.

114.    The ML Corporate Defendants, the Officer Defendants, and Citigroup were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering.

115.    Citigroup, through its subsidiary Smith Barney, is a seller within the meaning of the Securities Act because it: (a) transferred title to plaintiff and other purchasers of the securities; (b) transferred title to the securities to other underwriters and/or broker dealers that sold the securities as agents for Citigroup; and (c) solicited the purchase of the securities by plaintiff and other members of the Subclass.

116.    Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. The ML Corporate Defendants' and the Officer Defendants' actions of solicitation included signing the materially false and misleading Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering and participating in the preparation of the materially false and misleading registration statement amendments and prospectus supplements.

117.    The ML Corporate Defendants, the Officer Defendants, and Citigroup owed to plaintiff and the other members of the Subclass the duty to make a reasonable and diligent investigation of the statements contained in Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III

Preferred Securities offering to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

118.   The ML Corporate Defendants, the Officer Defendants, and Citigroup knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering as set forth above.

119.   Plaintiff and the other members of the Subclass offer to tender those securities they continue to own in return for the consideration paid for those securities together with interest thereon.

120.   By reason of the conduct alleged herein, the ML Corporate Defendants, the Officer Defendants, and Citigroup violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act.   Accordingly, plaintiff and the other members of the Subclass who hold Merrill preferred securities purchased or acquired pursuant or traceable to the above defective Registration Statement Amendment No. 2 for the 6.45% Trust II Preferred Securities offering and Registration Statement Amendment No. 3 for the 7.375% Trust III Preferred Securities offering have the right to rescind and recover the consideration paid for those securities and hereby elect to rescind and tender those securities to the defendants sued herein.   Plaintiff and the other members of the Subclass who have sold those securities are entitled to rescissory damages.

121.   Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.   Less than one year has

elapsed from the time of the offerings.

**COUNT V**

**AGAINST THE OFFICER DEFENDANTS**
**FOR VIOLATIONS OF § 15 OF THE SECURITIES ACT**

122.  Plaintiff realleges each of the allegations set forth above as if fully set forth herein. Plaintiff specifically does not incorporate Part II of this Complaint.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

123.  Because of their positions of control and authority as senior officers and directors of Merrill, the Officer Defendants were able to, and did, control the contents of the Registration Statement Amendments and Prospectus Supplements discussed above which contained false financial information.  The Officer Defendants therefore were "controlling persons" of Merrill within the meaning of § 15 of the Securities Act.

124.  The Officer Defendants each were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in Counts I and IV above, based on their having signed the Registration Statement Amendments and Prospectus Supplements discussed above, and on their having otherwise participated in the process that facilitated successful completion of the offerings made pursuant to each such Registration Statement Amendment and Prospectus Supplement.

125.  Therefore, the Officer Defendants are each liable jointly and severally with and to the same extent that Merrill is liable to plaintiffs and the other members of the Subclass who purchased securities in the offerings pursuant to one or more of the Registration Statement Amendments and Prospectus Supplements.

## PART II

## PLAINTIFF'S CLAIMS PURSUANT TO §§ 10(b) AND 20(a) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

126.   On November 3, 2006, the start of the Class Period, Merrill filed its quarterly report with the SEC on Form 10-Q, certified by defendants O'Neal and Edwards.  The Form 10-Q stated in part:

> Despite challenging market conditions during the third quarter of 2006, each of GMI's three major business lines- Fixed Income, Currencies, and Commodities ("FICC") (formerly Debt Markets), Equity Markets and Investment Banking - recorded increased net revenues compared with the third quarter of 2005. GMI's total net revenues were a record for a fiscal third quarter at $4.4 billion, up 21 percent from the year-ago quarter.  Pre-tax earnings were $1.5 billion, up 13 percent from the year-ago quarter, driven by strong net revenue growth.  The pre-tax profit margin was 33.2 percent, compared with 35.4 percent in the year-ago quarter, primarily due to higher expenses associated with investments for growth across the business, as well as the absence of a litigation provision reversal in the year-ago quarter.

> For the first nine months of 2006, GMI's net revenues were $13.5 billion, an increase of 30 percent from the first nine months of 2005.  Pre-tax earnings of $3.2 billion and the pre-tax profit margin of 23.4 percent included $1.4 billion in one-time compensation expenses incurred in the first quarter of 2006.  Excluding these onetime compensation expenses, pre-tax earnings for the first nine months of 2006 were $4.5 billion, up 29 percent from the year-ago period, and the pre-tax profit margin was 33.5 percent, down from 33.8 percent in the year-ago period….

> * * *

> ***Global Markets***

> For the third quarter of 2006, Global Markets net revenues were $3.6 billion, up 26 percent from the year-ago quarter. For the first nine months of 2006, Global Markets net revenues were a record at $10.9 billion, up 34 percent from the year-ago period.

> *Fixed Income, Currencies, and Commodities (formerly Debt Markets)*

> FICC net revenues include principal transactions and net interest profit (which management believes should be viewed in aggregate to assess trading results), commissions, revenues from principal investments, fair value adjustments on private equity investments made by non-broker-dealer subsidiaries that are held for capital appreciation and/or current income, and other revenues. The business lines included

in FICC are described in the Debt Markets section of the 2005 Annual Report. For the third quarter of 2006, FICC net revenues set a new quarterly record at $2.1 billion, up 26 percent from the third quarter of 2005. The increase in net revenues was driven primarily by increases in commodities and trading credit products, which more than offset declines from principal investing and trading interest rate products. The commodities results were driven principally by strong trading results in both natural gas and power in the United States and Europe, as well as significant revenues from structured transactions.

For the first nine months of 2006, FICC net revenues were $5.9 billion, up 20 percent from the first nine months of 2005, due primarily to the strong trading results in commodities and the trading of credit products. These increases were partially offset by declines in principal investing, rates, and foreign exchange.

*Equity Markets*

Equity Markets net revenues include commissions, principal transactions and net interest profit (which management believes should be viewed in aggregate to assess trading results), revenues from equity method investments, fair value adjustments on private equity investments that are held for capital appreciation and/or current income, and other revenues. The business lines included in Equity Markets are described in the 2005 Annual Report. During the third quarter of 2006, Equity Markets net revenues were $1.5 billion, an increase of 26 percent over the year-ago quarter, driven by higher revenues in private equity, cash trading, proprietary trading and equity financing and services. These increases were partially offset by a modest decline in equity-linked trading.

For the first nine months of 2006, Equity Markets net revenues were $4.9 billion, up 55 percent from the year-ago period, driven primarily by private equity-related gains, increased equity-linked and cash trading revenues, and higher equity financing and services net revenues.

127. Merrill's Form 8-K, dated January 18, 2007, contained a press release announcing

Merrill's financial results for fourth quarter and full year 2006, which stated in part:

Merrill Lynch today reported record full year net revenues, net earnings and earnings per diluted share for 2006, driven by strong growth in the firm's business segments. Net earnings for 2006 were $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to $34.7 billion.

Pre-tax earnings increased to a record $10.4 billion, the pre-tax profit margin rose to a record 30.1 percent, and the return on average common equity increased to 21.3 percent. Book value per common share was $41.37, up 15 percent from 2005. Merrill

Lynch's 2006 results included the one-time net gain arising from the closing of the merger between Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE:BLK) during the third quarter, which was essentially offset by the one-time non-cash compensation costs recorded in the first quarter.

These one-time items, in aggregate, increased both full year net revenues and non-interest expenses by approximately $2.0 billion, resulting in a slightly negative net impact to 2006 net earnings of $72 million, or 9 cents per diluted share. Adjusted to exclude the impact of those one-time items, full-year 2006 net earnings were $7.6 billion, up 48 percent from 2005, and net earnings per diluted share were $7.68, up 49 percent. On the same basis, pre-tax earnings of $10.4 billion increased 44 percent, as net revenues rose 26 percent to $32.7 billion; the pre-tax profit margin was 31.9 percent, up 4.1 percentage points; and the return on average common equity was 21.6 percent, up 5.6 percentage points. . . .

"We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

Fourth quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71 percent from the year-ago quarter but down 24 percent from the third quarter of 2006, which included the one-time net gain from closing the BlackRock transaction. Similarly, pre-tax earnings of $3.4 billion were up 65 percent from the year-ago period but down 19 percent from the third quarter, as net revenues of $8.6 billion were up 27 percent from the year-ago quarter and down 13 percent sequentially. The fourth quarter pre-tax profit margin was 39.0 percent, and the annualized return on common equity was 25.6 percent.

Excluding the one-time merger-related net benefits in the third quarter of 2006 from the sequential comparisons, Merrill Lynch's fourth quarter 2006 net earnings and diluted earnings per share were both 21 percent higher than the third quarter; pre-tax earnings were 42 percent higher; net revenues were 8 percent higher; and all those fourth quarter results would have set quarterly records.

128. On February 26, 2007, Merrill filed its Form 10-K for fiscal 2006, which included

results for the fourth quarter and full year 2006, and included the same financial results as previously

reported. The Form 10-K stated in part:

> During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including both interest rate and credit derivatives, principal investing, real estate, and foreign exchange.

> Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

> In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity linked trading business, another key area of investment which increased its revenues more than 50 percent in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

129.  On April 19, 2007, Merrill issued its financial results for the first quarter of 2007, in

a release which stated in part:

Merrill Lynch today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion. Net revenues were up 24 percent from the prior year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), and in all global regions.  These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pre-tax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc. (NYSE:BLK).

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pre-tax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chef executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. . . .

**Global Markets** & **Investment Banking (GMI)**

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted

organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

- GMI's first quarter 2007 net revenue were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

- Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

- Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

- Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

- Pre-tax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first quarter 2007 pre-tax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

130. By the end of April, Merrill's stock was trading above $90 per share.

131. At a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime market were "reasonably well contained . . . [t]here have been no clear signs it's spilling over into other subsets of the bond market, the fixed-income market and the credit market."

132. On July 17, 2007, Merrill issued a press release announcing its financial results for the second quarter of 2007 which stated in part:

Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.

Second quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pre-tax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.

Second quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pre-tax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pre-tax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

## THE TRUTH IS REVEALED

133. On October 5, 2007, Merrill issued a press release announcing a $4.5 billion charge for the third quarter of 2007. In relation to the charge, O'Neal stated that:

Despite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our [fixed income, currency and commodities] businesses than we expected earlier in the quarter. . . . While market conditions were extremely difficult and the degree of sustained dislocation unprecedented, we are disappointed in our performance in structured finance and mortgages. We can do a better job in managing this risk, as we have done with other asset classes, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities.

134. The market did not react adversely to this news, as it was in line with charges taken by other banks as a result of the tightened credit market.

135. Then, on October 24, 2007, Merrill issued a press release before the market opened announcing that the Company would take an $8 billion charge for the third quarter, instead of the $4.5 billion previously announced. The press release, titled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations of $2.85 Per Diluted Share; Record Net Revenues From Global Private Client, Equity Markets and Investment Banking for the First Nine Months of 2007," stated in part:

Merrill Lynch today reported a net loss from continuing operations for the third

–48–

quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months

–49–

was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the onetime items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these onetime items. . . .

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

- Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

- FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities.

*Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings prerelease. This is due to additional analyst and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.*

\* \* \*

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected

timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

- Equity Markets net revenues increased by 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

- Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

- The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

- GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

136.  In reaction to this news of its largest quarterly loss in its 93 year history, Merrill's stock closed at $63.22 on October 24, 2007, down 5.8% from the previous day's close of $67.12 on a volume of 52 million shares.  The 7.375% Trust III Preferred Securities closed down 1.25% from the previous day's close, while the 6.45% Trust II Preferred Securities closed down 1.4% from the previous day's close, and the 6.45% Trust I Preferred Securities closed down 2.23% from the previous day's close.

137.  Following what it characterized as Merrill's "startling" announcement, on October 24, 2007, Standard & Poor's Ratings Services lowered its credit ratings on Merrill from A+/A-1 to AA-/A-1+, with a negative outlook.

138.  Subsequently, on October 25, 2007, Merrill's stock closed at $60.90, down 3.6% from the previous day's close on a volume of 41 million shares, and down a total of 9.2 percent from its closing price on October 23, 2007.  Merrill's 7.375% Trust III Preferred Securities closed down a total of 1.4% from the closing price of October 23, 2007.  Merrill's 6.45% Trust II Preferred Securities closed down a total of 3.2% from the closing price of October 23, 2007, while the 6.45% Trust I Preferred Securities closed down a total of 2.6% from the closing price of October 23, 2007.

139.  On November 1, 2007, the SEC initiated an informal investigation into whether Merrill had violated federal securities laws when it announced a $4.5 billion third quarter charge, rather than the $8 billion charge, in its press release of October 5, 2007.

140.  On November 2, 2007, the close of the Class Period, THE WALL STREET JOURNAL reported that "in a bid to slash its exposure to risky mortgage-backed securities, [Merrill] has engaged in deals with hedge funds that may have been designed to delay the day of reckoning on losses, people close to the situation said."  The article continued: "The transactions are among the

issues likely to be examined by the Securities and Exchange Commission.  The SEC is looking into

how the Wall Street firm has been valuing, or 'marking,' its mortgage securities and how it has

disclosed its positions to investors, a person familiar with the probe said.  Regulators are scrutinizing

whether Merrill knew its mortgage problem was bigger than what it indicated to investors

throughout the summer."

141.  Upon this news, Merrill's stock dropped even further to close at $57.28 on November

2, 2007.  From Merrill's shocking announcement on October 24, to THE WALL STREET JOURNAL

report on November 2, Merrill's stock dropped a total of 14.6%.  Over the same period of time,

Merrill's 7.375% Trust III Preferred Securities dropped a total of 5.3%, while Merrill's 6.45% Trust

II Preferred Securities dropped a total of 7.8%, and the 6.45% Trust I Preferred Securities dropped a

total of 6.9%.

## SCIENTER ALLEGATIONS

142.  As alleged herein, Merrill, O'Neal, Fakahany, Fleming, and Edwards  knew that the

public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of federal

securities laws.  As set forth elsewhere herein in detail, Merrill and the Officer Defendants  acted

with scienter in that Merrill was exposed to more CDOs containing subprime debt than it disclosed,

and in that Merrill and the Officer Defendants' statements during the Class Period were materially

false and misleading because they failed to disclose to the market the extent of the Company's

exposure to losses arising from its investments in CDOs and other subprime loans due to the

deteriorating subprime mortgage market which caused the Company's portfolio to be impaired.

143. On October 25, 2007, an article in THE WALL STREET JOURNAL confirmed that Merrill's top management had been aware of the risk and concealed it, even as they continued to invest in CDOs in order to collect the lucrative fees involved. The article stated, in part:

> After presiding over one of the biggest losses in Wall Street history, Merrill Lynch & Co. Chief Executive Stanley O'Neal finds himself with a weakened power base as he fends off charges that he let the firm's exposure to risky mortgages get out of hand.
>
> Merrill said yesterday it took a $8.4 billion hit in the third quarter from revaluing bonds backed by mortgages and other write-downs. That was far higher than the $5 billion hit Merrill estimated just two and a half weeks ago - a surprise that led the firm's stock price to fall 5.8% as its credit rating was downgraded.
>
> Overall, Merrill recorded a $2.24 billion loss for the quarter, making it the only one of Wall Street's five biggest investment banks to end the period in the red. Ratings firm Standard & Poor's described the write downs as "staggering" and blamed "management miscues."
>
> * * *
>
> Mr. O'Neal pushed to expand Merrill's role in new kinds of bonds and other financial instruments, which helped propel profits in recent years before leading to trouble. Merrill's annual operating profit averaged $5.22 billion between 2003 and 2006, more than double the $2.11 billion average in the preceding five years.
>
> The $8.4 billion hit leaves it clear that Mr. O'Neal and his team didn't always appreciate the risks they took to achieve the greater profits. The write-downs surpass a $6 billion loss suffered in 2005 by the hedge fund Amaranth LLC, which had stood as the largest single known Wall Street loss.
>
> * * *
>
> On the conference call, Mr. O'Neal accepted a share of responsibility, saying, "I am accountable for the mistakes as I am accountable for the performance of the firm overall."
>
> That didn't prevent a tough interrogation by analysts who wondered why Merrill's estimate of its losses a few weeks ago was so far off. When Mr. O'Neal and another Merrill executive noted that Merrill had volunteered more information about its exposure than its Wall Street peers, analyst Mike Mayo of Deutsche Bank AG retorted, "But your peers didn't take an $8 billion write-down."
>
> Merrill's $2.24 billion overall loss for the quarter came to $2.82 a share, compared with a profit of $1.94 billion, or $2 a share, a year earlier, before a onetime gain from

the transfer of Merrill's money-management unit to BlackRock. It was Merrill's first quarterly loss since 2001.

* * *

Merrill said it had cut in half its exposure to one risky asset class - collateralized debt obligations, which are securities backed by pools of assets including mortgages. It said it now has $15.2 billion in CDOs, down from $32.1 billion three months earlier.

Analysts pushed Merrill to say whether it had cut its exposure by selling the CDOs or by buying hedges in an attempt to balance future losses. Mr. O'Neal declined to give a breakdown.

Merrill has been Wall Street's leading underwriter of CDOs since 2004. In addition to its mortgage and CDO write-downs, Merrill recorded an additional $463 million of losses, or $967 million before deducting fees, from commitments to finance leveraged buyouts and other corporate activities. The firm said it exercised "aggressive and effective risk management" in limiting the corporate loan losses.

For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world. But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging. Many investors felt they had invested enough money in this asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market.

For Merrill, the fees it earned from arranging deals were too lucrative to give up. Its profits averaged 1.25% of the deal volumes it did, or around $12.5 million for each $1 billion CDO. More than 70% of the securities issued by each CDO bore triple-A credit ratings. Traditionally these top-rated securities were insured by a financial guaranty company, which effectively bore the risk of losses. But by mid-2006, few bond insurers were willing to write protection on CDOs that were ultimately backed by subprime mortgages to people with poor credit histories.

According to people familiar with the matter, Merrill put large amounts of AAA-rated CDOs onto its own balance sheet, thinking they were low-risk assets because of their top credit ratings. Many of those assets dived in value this summer.

144. As a result of Merrill, O'Neal, Fakahany, Fleming, and Edwards' false and misleading statements, during the Class Period, Merrill's securities traded at inflated levels. However, following Merrill's announcements described above, Merrill's stock dropped by more than 30% from its Class Period high.

## LOSS CAUSATION

145.  During the Class Period, as detailed herein, Merrill, O'Neal, Fakahany, Fleming, and Edwards engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Merrill preferred securities and common stock and operated as a fraud or deceit on Class Period purchasers of Merrill preferred securities or common stock by misrepresenting the Company's business and prospects.  Rather than truthfully disclosing during the Class Period that Merrill's business was not as healthy as represented, Merrill and the Officer Defendants falsely overstated Merrill's net income, and falsely concealed the problems with its CDO portfolio.  When the truth concerning the health of Merrill's business entered the market beginning October 24, 2007, the price of Merrill preferred securities and common stock fell drastically.

146.  On October 24, 2007, before the market opened, Merrill and the Officer Defendants were forced to publicly disclose the extent of problems with the Company's CDO portfolio, causing its stock to drop to as low as $61.40 per share on October 24, 2007 – a one day decline of $5.72 per share.  As a direct result of Merrill and the Officer Defendants' admissions and the public revelations regarding the truth about Merrill's profitability and its actual business prospects going forward, Merrill's stock price dropped more than $5 per share in October 2007 and more than $30 per share from May 2007.  This drop removed the inflation from Merrill's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

147.  The additional reports on November 1 and 2 that Merrill was aware that its losses were far higher than originally reported and that it may have sought to delay those losses through undisclosed hedge fund transactions, as well as the initiation of the SEC's information investigation caused the price of Merrill's preferred securities and common stock to drop.  Merrill's stock price

dropped further, from $62.19 per share to $57.28 per share, further removing the inflation from Merrill's stock price, and causing real economic loss to investors who had purchased the stock during the Class Period.

148. The price of Merrill's 7.375% Trust III Preferred Securities and 6.45% Trust II Preferred Securities followed a similar downward path. The price of Merrill's 7.375% Trust III Preferred Securities dropped more than $1.00, the price of Merrill's 6.45% Trust II Preferred Securities dropped by almost $2.00, and the price of the 6.45% Trust I Preferred Securities dropped by more than $1.50 between October 23, 2007 and November 2, 2007. As with Merrill's common stock, these price drops removed the inflation from the price of Merrill's 7.375% Trust III Preferred Securities, 6.45% Trust II Preferred Securities, and 6.45% Trust I Preferred Securities and caused real economic loss to investors who had purchased preferred securities and common stock during the Class Period.

**COUNT VI**

**AGAINST MERRILL, O'NEAL, FAKAHANY, FLEMING, AND EDWARDS
FOR VIOLATIONS OF § 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED THEREUNDER**

149. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

150. During the Class Period, the ML Corporate Defendants, O'Neal, Fakahany, Fleming, and Edwards carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Merrill preferred securities and common stock at artificially inflated prices. In furtherance of this

unlawful scheme, plan and course of conduct, the ML Corporate Defendants and the Officer Defendants, and each of them, took the actions set forth herein.

151.  The ML Corporate Defendants and the Officer Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's preferred securities and common stock in an effort to maintain artificially high market prices for Merrill preferred securities and common stock in violation of § 10(b) of the Exchange Act and Rule 10b-5.

152.  The ML Corporate Defendants and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Merrill as specified herein.

153.  The ML Corporate Defendants and the Officer Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Merrill and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Merrill preferred securities and common stock during the Class Period.

154.    The ML Corporate Defendants and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    The ML Corporate Defendants and the Officer Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Merrill's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its preferred securities and common stock.  As demonstrated by their overstatements and misstatements of the Company's business, operations and income throughout the Class Period, the ML Corporate Defendants and the Officer Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

155.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Merrill preferred securities and common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Merrill's publicly-traded preferred securities and common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the ML Corporate Defendants and the Officer Defendants but not disclosed in public statements during the Class Period, plaintiff and the other members of the Class acquired Merrill preferred securities and common stock during the Class Period at artificially high prices and were damaged thereby.

156.  By virtue of the foregoing, the ML Corporate Defendants, O'Neal, Fakahany, Fleming, and Edwards violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

157.  As a direct and proximate result of the ML Corporate Defendants, O'Neal, Fakahany, Fleming, and Edwards' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's preferred securities and common stock during the Class Period.

## COUNT VII

### AGAINST O'NEAL, FAKAHANY, FLEMING, AND EDWARDS PURSUANT TO § 20(a) OF THE EXCHANGE ACT

158.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

159.  Defendants O'Neal, Fakahany, Fleming, and Edwards acted as controlling persons of Merrill within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, their ownership of Merrill stock, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants O'Neal, Fakahany, Fleming, and Edwards had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Defendants O'Neal, Fakahany, Fleming, and Edwards were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the

statements to be corrected.

160.  Defendants O'Neal, Fakahany, Fleming, and Edwards were each culpable participants in the violations alleged above by their acts and omissions.  As a direct and proximate result of their wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's preferred securities and common stock during the Class Period.

161.  Therefore, defendants O'Neal, Fakahany, Fleming, and Edwards are each liable jointly and severally with and to the same extent as the ML Corporate Defendants for the ML Corporate Defendants' violation of § 10(b) of the Exchange Act.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    February 26, 2008
        New York, New York

### MURRAY, FRANK & SAILER LLP

By: _____
         Brian Brooks (BB 7442)
Marvin L. Frank (MF 1436)
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone:  212/682-1818
Facsimile:   212/682-1892

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 26, 2008, I served the foregoing documents by first-class mail on the following:

**Regina Marie Calcaterra**
Barrack, Rodos & Bacine
1350 Broadway
Suite 1001
New York, NY 10018

**Jeffrey Philip Campisi**
Kaplan Fox & Kilsheimer LLP
850 Third Avenue
14th Floor
New York, NY 10022

**Arthur M Stock**
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Brian D. Brooks